DONALD C. SIMMONS AND NANCY T. SIMMONS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4509–77.     Filed September 26, 1979.

*Norman J. Voog*, for the petitioners.
*Thomas P. Dougherty, Jr.*, for the respondent.

STERRETT, *Judge:* * Respondent determined a deficiency in petitioners' income taxes paid for their taxable year ended December 31, 1974, in the amount of $6,375. The only issue for our decision is whether petitioners' stock in a small business corporation qualified as section 1244 stock entitling them to an ordinary loss deduction on their disposition thereof during the taxable year in issue.

## FINDINGS OF FACT

All the facts were stipulated and are so found. The stipulation of facts, and exhibits attached thereto, are incorporated herein by this reference.

Petitioners Donald C. and Nancy T. Simmons, husband and wife, filed a timely joint Federal income tax return, on a cash basis, for their taxable year ended December 31, 1974. There is no indication in the record with respect to where this return was filed. At the time they filed their petition herein, petitioners resided in West Hartford, Conn. As petitioner Nancy T. Simmons is a party hereto solely by virtue of having filed jointly with her husband, "petitioner" as used herein shall refer to Donald C. Simmons.

Murteza Restaurants, Inc. (Murteza), is a "small business corporation" within the meaning of section 1244(c)(2), I.R.C.

---

*By order of the Chief Judge dated June 18, 1979, this case was reassigned from Judge Cynthia H. Hall to Judge Samuel B. Sterrett for disposition.

1954. Petitioner acquired the following number of shares of Murteza's common stock on the following dates:

| | | |
|---|---|---|
| July 18, 1973 ......... | 50 | Shares |
| July 28, 1973 ......... | 242 | Shares |
| Sept. 27, 1973 ........ | 10 | Shares |
| Total ................. | 302 | Shares |

During 1973, and until December 31, 1974, petitioner was both the vice president and a director of Murteza. At no time did petitioner own sufficient stock in Murteza, directly or constructively, so as to be in "control" of that corporation within the meaning of section 368(c).

On June 14, 1973, Murteza's board of directors held a special meeting. The minutes of this meeting reflect that the following resolution was adopted:

5. That a plan whereby Donald C. Simmons would put up stock as collateral for a lease for the benefit of this corporation and he be issued the equivalent fair market value of stock in this corporation on executing an agreement whereby he agrees to execute any and all papers on demand of the corporation whereby title will vest in the corporation in the pledged stock once the lessor releases his lien on said stock, is adopted.

Also, on June 14, 1973, Murteza adopted a plan to offer its common stock for sale in a manner that would cause its shareholders "to receive the benefits of section 1244" with respect to said stock. On July 18, 1973, petitioner agreed to purchase, and actually purchased, 50 shares of Murteza common stock at $100 per share pursuant to this plan.

On July 28, 1973, petitioner owned 250 shares of Exxon Corp. common stock with a fair market value of $18,346. Petitioner's adjusted basis in this Exxon stock was $18,978. On July 28, 1973, petitioner, pursuant to the board's resolution of June 14, 1973, endorsed his Exxon stock over, and delivered possession of this stock, to Antonio Reale (Reale), Murteza's landlord. On the same day, July 28, 1973, petitioner (1) agreed to purchase 242 shares of Murteza's common stock pursuant to the company's section 1244 plan and (2) was issued 242 shares of Murteza common stock with a fair market value of $24,200. Thus, on or about July 28, 1973, petitioner had complied with the terms of the above-quoted resolution and had been issued 242 shares of Murteza common stock in return therefor.

On September 27, 1973, petitioner agreed to purchase, and

actually purchased, 10 shares of Murteza common stock at $100 per share, again pursuant to the firm's section 1244 plan.

On his 1973 Federal income tax return, petitioner recognized a long-term capital gain of $5,222 ($24,200–$18,978) in respect of his disposition of his Exxon stock. On December 31, 1974, petitioner sold all of his Murteza stock, including the 60 shares he had purchased, in an arm's-length transaction for $100. As a result of this sale, petitioner deducted $24,246 as an ordinary loss on the sale of section 1244 stock (i.e., $100 received in respect of property having a basis of $24,346) on his 1974 calendar year return.

The parties have stipulated that the sole issue in this case is whether the 242 shares of Murteza common stock which petitioner acquired on July 28, 1973, qualified as section 1244 stock, as that term was defined in section 1244(c), when it was disposed of at a loss by petitioner in 1974. The parties have also stipulated that had petitioner sold his Exxon stock on July 28, 1973, and delivered a broker's check to Reale on that date, the 242 shares of stock issued to petitioner on July 28, 1973, would have been section 1244 stock, and petitioner would have been entitled to take an ordinary loss on the disposition thereof.

There is no indication in the record whether any dividends were paid on the Exxon stock during the period between July 28, 1973, and December 31, 1974, or if dividends were paid, to whom they were paid. Respondent has conceded that the 60 shares of Murteza common stock actually purchased by petitioner qualify for ordinary loss treatment under section 1244(a).

OPINION

Petitioner contributed 250 shares of Exxon Corp. stock to the beneficial use of Murteza. In exchange therefor, and on the same day that he parted with his Exxon stock, petitioner received 242 shares of Murteza common. Relying on section 1244(c) as it read for the year at issue, respondent argues that petitioner received the Murteza common stock in exchange for the Exxon stock and that, therefore, this block of 242 shares of Murteza common stock does not qualify as section 1244 stock.[1] Petitioner argues

---

[1] As it stood during the taxable year in issue, sec. 1244 read as follows:

SEC. 1244. LOSSES ON SMALL BUSINESS STOCK.

(a) GENERAL RULE.—In the case of an individual, a loss on section 1244 stock issued to such

that there were actually two separate transactions involved in his receipt of the 242 shares in issue: (1) His contribution of his Exxon stock to the use of Murteza, which (2) generated a debt owed him by Murteza that he canceled in exchange for 242 shares of Murteza stock within the meaning of section 1.1244(c)–1(f)(1), Income Tax Regs.[2] While in some ways a harsh result, the facts of this case seem so clear that we have no difficulty in holding for respondent.

For section 1244 purposes, stock issued in consideration for the cancellation of indebtedness of the corporation is considered issued in exchange for money or other property—subject to limitations not here in issue. Sec. 1.1244(c)–1(f)(1), Income Tax Regs. This is what petitioner would have us find occurred herein. The distinction petitioner would have us draw is, however, an artificial one. The substance of the case is clear—petitioner contributed his Exxon stock to the use of Murteza as collateral for its lease obligation and received 242 shares of Murteza common stock in exchange therefor.

On July 28, 1973, pursuant to his firm's resolution of June 14, 1973, petitioner endorsed his Exxon stock over, and delivered the stock, to Reale. As of that time, petitioner's only connection with this stock was his obligation to deliver legal title thereto to

---

individual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as a loss from the sale or exchange of an asset which is not a capital asset.

\*         \*         \*         \*         \*         \*         \*

(c) SECTION 1244 STOCK DEFINED.—

(1) IN GENERAL.—For purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if—

\*         \*         \*         \*         \*         \*         \*

(D) such stock was issued by such corporation, pursuant to such plan, for money or other property (other than stock and securities) \* \* \*

Sec. 1244 was amended by Pub. L. 95–600, sec. 345(c), 92 Stat. 2763, 2845, effective for stock issued after Nov. 6, 1978, Pub. L. 95–600, sec. 345(e), *supra*.

[2]Petitioner also puts forth an additional argument which runs as follows: (1) Under local law, an endorsed security is a negotiable instrument, (2) the parties have stipulated that, had petitioner sold his Exxon stock and delivered a broker's check to Reale, also a negotiable instrument, petitioner would be entitled to sec. 1244(a) treatment for the 242 shares in issue, and, therefore, (3) petitioner should be treated as if he had delivered a negotiable instrument to Reale. The effective transfer of any security requires both endorsement and delivery thereof. Conn. Gen. Stat. Ann. sec. 42(a)–8–307–309 (1960). Clearly, if sec. 1244(c)(1)(D) could be avoided merely by endorsing a security before transferring it to a small business corporation, little of substance would be left to that paragraph and of Congress's intent in enacting it. We believe that, when Congress said "stock or securities," it did not intend for the courts to read that section as if it said "non-negotiable stock or securities." Finally at one point in his reply brief, petitioner implies that he had purchased, through the exchange of his Exxon stock, a debt owed by Murteza to Reale. There is no evidence in the record to support this claim, and it would not appear that this claim comports with the parties' intent. In fact, the parties have stipulated that the Exxon stock was given to Reale as "collateral" for a lease.

Murteza on demand. As of that date, complete beneficial ownership of the Exxon stock resided in Murteza, subject to Reale's perfected security interest therein. On the same day that petitioner delivered his Exxon stock to Murteza's landlord, Murteza transferred the 242 shares here in issue to petitioner. It is clear that each stock transfer was in consideration of the other.

Petitioner argues that he received the Murteza stock here in issue, not in exchange for his Exxon stock, but in discharge of an obligation or debt of Murteza which arose on his transfer of his Exxon stock to Reale. It is true that, when petitioner transferred his Exxon stock to Reale pursuant to the June 14, 1973, resolution, an obligation of Murteza to him momentarily arose, assuming that petitioner's transfer was first in time. But the same is true of any exchange of property for property. When one party performs his part of a sales contract, the duty arises on the part of the other party to render return performance. Nonetheless, each party's obligation to perform is considered dependent upon the other's performance.

Thus, if any obligation of Murteza to petitioner can be said to have momentarily arisen, it was merely Murteza's obligation to deliver to petitioner 242 shares of Murteza stock. While we may agree that Murteza had an obligation to issue the stock, that stock was not issued in respect of an "indebtedness" within the meaning of the regulations. The fact that petitioner transferred his Exxon stock directly to Murteza's landlord to hold as security for a corporate liability instead of transferring his stock to the corporation so that the corporation could transfer it to Reale, is irrelevant.

That petitioner himself recognized that he had received the Murteza stock in exchange for his Exxon stock is demonstrated by the amount of loss he claimed on his return. Section 1244(d) says in relevant part:

SEC. 1244(d). SPECIAL RULES.—
   (1) LIMITATIONS ON AMOUNT OF ORDINARY LOSS.—
     (A) CONTRIBUTIONS OF PROPERTY HAVING BASIS IN EXCESS OF VALUE.—If—
       (i) section 1244 stock was issued in exchange for property,
       (ii) the basis of such stock in the hands of the taxpayer is determined by reference to the basis in his hands of such property, and
       (iii) the adjusted basis (for determining loss) of such property immediately before the exchange exceeded its fair market value at such time,

then in computing the amount of the loss on such stock for purposes of this section the basis of such stock shall be reduced by an amount equal to the excess described in clause (iii).

Apparently believing that the basis of his Murteza stock had to be determined by reference to his Exxon stock basis in his hands, petitioner claimed a $24,346 basis for his Murteza stock on his return, i.e., $6,000 (the amount he had paid in cash for his other 60 Murteza shares) plus $18,346 in respect of the 242 shares of Murteza common stock here in issue (i.e., his Exxon stock fair market value). Sec. 1244(d)(1)(A). Twenty-four thousand three hundred forty-six dollars ($24,346) less his sales proceeds of $100 resulted in petitioner's claimed deductible loss of $24,246. Thus, it is clear that petitioner himself calculated his claimed section 1244 deduction on the basis that he had received his Murteza stock in exchange for his Exxon stock.

Thus, we conclude that the block of 242 Murteza shares petitioner received in exchange for his Exxon stock was not section 1244 stock entitled to treatment under section 1244(a). The limitation of section 1244(d) does not, therefore, apply, and petitioner is entitled to a long-term capital loss thereon equal to his cost basis therein less that part of the $100 sale price for all his stock allocable thereto, i.e., $24,200–$80.13 = $24,119.87. In addition, petitioner is entitled to an ordinary loss of $5,980.13 on his section 1244 stock.

*Decision will be entered under Rule 155.*

